MILLER, Judge.
Huddleston, Emerson, Stiller and Associates, architects, sued W. A. Williams for a $17,280 fee for services rendered pursuant to an alleged oral contract. Alternatively plaintiffs contended that they were entitled to a reasonable fee in the amount of $18,900. Plaintiffs appealed the trial court judgment holding that the final plans and specifications were not ordered by defendant. We affirm.
The trial court also found that W. A. Williams was acting as agent for his corporation, Williams Enterprises, Inc.; that plaintiffs contract, if any, was with the corporation; and that Williams could not be held liable for the corporation debts. We pretermit this issue.
Plaintiff s-appellants contend that the trial court committed manifest error in its finding of fact, thus presenting primarily an issue of fact for determination. Their primary contention is that the final plans and specifications were ordered by Williams by long distance telephone conversation held on Sunday, February 4, 1968 and confirmed by a telephone call the next day. It is reasoned that this telephone call when *590 considered along with their prior negotiations amounted to an acceptance of the fee proposal made in April 1966. Alternatively it is contended that Williams is obligated to pay a reasonable fee for the final plans and specifications which he ordered in February of 1968. Lastly it is contended that Williams agreed in March of 1968 to pay a fee of $17,280.
Williams Enterprises, Inc., a corporation owned primarily by defendant W. A, Williams, owned property in Huntsville, Alabama upon which was situated a motel. The property was located next to three large hospitals and Williams planned to convert the property into a convalescent home. In April of 1966, Williams contacted plaintiffs because he understood that their firm had designed a large number of rest homes. He also needed funds to finance construction. He understood that plaintiffs could perform the architectural services and also assist in finding financing for the project.
On or about April 6, 1966 the parties discussed remodeling the motel and other alternatives including demolishing the motel and constructing a one story or a three story convalescent home. It was agreed that for a fee of $500, plaintiffs would conduct a study and determine the feasibility of remodeling the structure on the property.
Plaintiffs contend that much time was spent at this meeting thoroughly discussing the architects’ fees for the ultimate work, and that they delivered to Williams various booklets explaining their work and setting forth the terms of their employment contract. Defendant denied discussing any fee other than the $500 fee, and denied that he received booklets at this meeting. The trial court held that the booklets were delivered at that meeting. Tr. 612.
Following the April 1966 meeting, plaintiffs undertook the preliminary' study and analysis of the existing structure and the $500 fee was paid. Thereafter there was a loose working arrangement between plaintiffs and defendant. There were various discussions relative to different sizes of nursing homes, cost estimates were made, applications were made both for F.H.A. and private financing, a zoning variance was obtained from the proper authority in Huntsville, preliminary floor plans were prepared showing a remodeling of the motel, a one story and a three story convalescent home. For some of this work, plaintiffs claim to have agreed with Williams that an additional fee of $500 was to be paid, but this was denied. This second $500 fee was not paid and plaintiffs did not pursue that claim at that time. Tr. 409.
According to plaintiffs, on Sunday, February 4, 1968, Williams telephoned the architects’ office and talked to the firm partner T. B. Emerson. Emerson was aware of the Huntsville project, but did have responsibility for the work. Emerson understood from the telephone call that Williams needed complete plans and specifications prepared within two weeks so that he could obtain a building permit and prevent his zoning variance from expiring. Emerson testified that he explained that this would take from four to six weeks to complete, and Williams asked them to do as much as possible within two weeks. The next day, J. M. Stiller, who was the partner primarily in charge of the Huntsville project, telephoned Williams and had his partner Emerson listen in on an extension telephone. According to Stiller and Emerson, Williams confirmed the request of the previous day, and specified that the plans and specifications were to be based upon the preliminary plan for a three story structure. The preliminary plan had earlier been accepted by the F.H.A. and by the Huntsville Board of Adjustment.
Williams denied that either conversation took place. Plaintiffs do not suggest that they demanded that Williams deliver to them a signed copy of the contract before they would undertake to prepare the final plans and specifications. After preparing *591 these plans, they delivered them without requiring Williams to sign a contract.
Williams admits that he talked by telephone to plaintiffs on several occasions and asked for some plans, but according to him, the only plans he requested were copies of the preliminary plans, sometimes called field plans. Tr. 567. He specifically denied that he needed plans as of February 4 to maintain his zoning variance. It was established that the zoning variance expired on January 24, 1968.
It is certain that plaintiffs understood that Williams ordered final plans and specifications. The entire office force worked overtime and to the exclusion of all other projects for a two week period. The firm engaged a mechanical engineering firm and a structural engineering firm to do their portion of the work on the same basis. Substantial fees were incurred with both firms. Work which would ordinarily take three months to complete was delivered on February 21, 1968, just 17 days from the date that plaintiffs understood that the final plans were ordered. On February 21, the plans were approximately 80% complete, the structural design portion was 100% complete and the mechanical engineering was complete except for some coordinating with the architectural drawings.
Also on February 21, at Williams’ telephone request plaintiffs mailed a copy of the plans to Tower Construction Company in Dallas, Texas, another set was mailed to a contractor in New Orleans and five sets were mailed to Williams in Many, Louisiana.
As noted before Williams contends that he only requested preliminary plans which had been prepared for the $500 fee. We note that building permits can be obtained on preliminary drawings with the knowledge that they will be supplemented with more complete drawings. Tr. 473. Williams contends that he had no financing for the project and therefore did not need the plans and specifications. Plaintiffs admitted that they did not know how Wil-Hams was going to finance the project.
Williams admits that he received a large bundle of papers from plaintiffs, but contends that he didn’t open the package. Tr. 568. At the March 1968 conference Williams and plaintiffs discussed the fact that Williams was then attempting to sell the property to others. Williams contends that he came into possession of some plans at that meeting with the understanding (vigorously denied by plaintiffs) that he would attempt to sell the plans and specifications along with the property. Tr. 573. He brought several sets of the plans to Huntsville (Tr. 577) and delivered them to a business acquaintance who in turn brought the plans to Mr. Morris Adams, an architect in Huntsville.
Adams apparently did not understand that the plans were only 80% complete, and he found that additional work had to be done. At any rate plaintiffs’ plans were rejected and Adams was employed by others to draw plans for a convalescent home. Adams’ plans were based on the general plan as drawn by plaintiffs. Williams explains that these plans were made available only in an effort to sell the work performed by plaintiffs. Tr. 575.
As of the January 28, 1970 trial, no building permit had been taken for construction using either set of plans.
This suit was filed on August 15, 1968. Three sets of plaintiffs’ plans and specifications were returned to plaintiffs in an envelope from Williams’ attorney postmarked August 26, 1968. There was no explanation for the return of the plans. One of these three sets bore notations indicating that the traffic access thereon had been reviewed and approved by the Traffic Engineering Department of the City of Huntsville on March 1, 1968, approximately nine days after the plans were mailed to Williams. This was not explained by Williams.
Plaintiffs argue that Williams conducted himself in such a way as to leave no doubt that he was aware of plaintiffs’ work on *592 the plans and specifications and was accepting it on the terms proposed by plaintiffs when he:
“1. Telephoned Mr. Stiller from Dallas, Texas, on February 20, or 21, 1968, and, as related by Mr. Stiller, ‘We were requested by Mr. Williams to mail one set of plans to Mr. Jones with Tower Construction Company in Dallas, Texas, who was going to give him an estimate which he could take to the City of Huntsville and take out a building permit in order to protect his zoning. Then five (5) sets were requested to be sent to Many where he would pick them up and take them on down to have a contractor in New Orleans bid.’
“2. Delivered one or more sets of plans to Mr. Leonard D. Storie in Huntsville, Alabama, for his review and possible use.
“3. Never objected to the fact that the plans had been sent to him and never stated that he did not order them.
“4. Retained for approximately six months the five sets of plans sent to him and returned only three sets, and then only after the instant suit was filed.
“5. Received numerous bills and letters concerning the fee of the Huddles-ton Firm and never protested that he had not employed it or that he had not agreed to the fee as set forth in the bills.”
Plaintiffs-appellants further argue that “perhaps, (plaintiffs) should have insisted that the contract be signed immediately (when on February 4, 1968 Williams allegedly ordered the final plans and specifications), but there are several factors which make understandable its failure to do so. Until Williams called to tell the Huddles-ton Firm to prepare final plans, it was uncertain as to whether or not Williams would have final plans prepared for the project, and, consequently, the matter of a written contract was not of particular urgency. Written evidence of the contract became more important when Williams called and placed the Huddleston Firm in a last-minute emergency situation to comply with his requests to complete the plans within two weeks time. Appellant was then faced with an option of refusing to begin work on the plans until Williams came to Shreveport to sign the written contract, which refusal may have further jeopardized the entire project, or of relying upon appellee’s verbal assurances that he was in complete agreement with respect to fee and other related matters discussed with him by the Huddleston Firm and would sign a written contract setting out these matters and deliver it to the Hud-dleston Firm within the next few days. The fact that the Huddleston Firm elected to begin work, relying on its verbal agreement with Williams, should not and does not affect appellant’s right to recovery under contract where, as here, the terms of the proposal were clearly understood by all parties and the proposal was accepted by appellee.” (Parenthetical additions by the writer.)
The trial court’s written reasons appropriately note that:
“The record in this case is quite voluminous, and the testimony of the opposing parties is in conflict on most points. A large number of documents were filed in evidence by both sides, and the parties, of course, disagree as to what was proved or corroborated by each, and prior to a resolution of the issues this court, like the able author of the opinion in the case of Haase v. Brumfield [La.App.] 137 So.2d 680, opines in the language of that court as follows:
‘ * * * it is appropriate to point out that all of the unpleasantness, controversy and litigation could have been avoided by a written contract setting forth the obligations, duties and charges to be made by the architect, and consent thereto of the defendant. Though such con *593 tract need not be in writing, it is apparent that an architect in dealing with the general public would eliminate the ugly-head of controversy as to his fee by the simple expediency of reducing the agreement to writing.’ ”
******
“ * * * Failure of the defendant to sign and give his consent thereto (to the printed form of agreement between owner and architect) cannot in light of the testimony of plaintiffs’ witnesses be deemed a mere oversight, because it was repeatedly stated by the witnesses that they made numerous attempts over the entire period of dealing with the defendant to obtain his signature to the written contract, but were unable to do so. No stronger proof can be offered to the conclusion that the defendant in this case did not agree to its terms.” (Parenthetical addition by the writer.)
******
“ * * * the court finds it incomprehensible that the plaintiff could in good faith reach the conclusion that a binding agreement had been reached by the parties as a result of a hasty telephone call, especially in light of their past experience over a two-year period, where the defendant had repeatedly refused to sign the contract * * * ”
We, like the trial court, recognize substantial equity in favor of plaintiffs. But we fail to find manifest error in the finding that plaintiffs failed to prove that defendant contracted to employ plaintiffs. Plaintiffs also failed to prove that the final plans and specifications were ordered by Williams.
From April of 1966 plaintiffs continually and repeatedly requested that Williams sign a contract of employment. At Tr. 408, Huddleston testified that Williams “* * * agreed to (the 7% fee) and promised us repeatedly through the ensuing years that he would send this to us but he never managed to get around to dropping it by the office or putting it in the mail.” At Tr. 461, Huddleston testified that Williams was always difficult to find.
At Tr. 499, plaintiff Stiller testified that during the fall of 1967, the firm “ * * * kept trying to get Mr. Williams to sign our contract.” But they were unsuccessful in reaching him by telephone or by mail. When they did hear from Williams, he did not refuse to sign the contract. He just never got around to signing it.
The burden rests with plaintiffs to prove the existence of a contract of employment between them and defendant for the architectural services and the fee agreed upon to be charged therefor. Allison v. Pick, 229 La. 524, 86 So.2d 179 (1956); Haase v. Brumfield, 137 So.2d 680 (La.App. 1 Cir. 1962).
The equities favoring the architects here are no stronger than those in the cases of MacDonnell v. Dreyfous, 144 La. 891, 81 So. 383 (1919) and Andry & Feitel v. Ewing, 15 La.App. 272, 130 So. 570 (Orls.La.App.1930). In both cases the architects received no payment for their services because the bids materially exceeded the maximum amount which the owner specified was available to spend for the buildings.
Plaintiffs’ alternative claim for a reasonable fee “presupposes a finding by the Court that Williams did instruct the Hud-dleston Firm to prepare final plans and specifications.” Plaintiffs have failed to show manifest error in the trial court’s decision that only the preliminary plans were ordered by Williams.
Plaintiffs’ final contention is that Williams agreed to pay a fee of $17,280 at a conference in March of 1968. The trial court denied this claim on the finding that Williams refused to sign that settlement offer. Plaintiffs have failed to show manifest error.
The judgment is affirmed. Costs are assessed to plaintiffs-appellants.
Affirmed.